# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | No. 06 C 5812 |
| v. | ) ) ) | Honorable Charles R. Norgle |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, O'M & ASSOCIATES LLC, DBA O'MALLEY & ASSOCIATES | ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is Plaintiff Metropolitan Life Insurance Company's ("MetLife") motion to disqualify the law firm Winston & Strawn, LLP ("Winston") as counsel for Defendant Guardian Life Insurance Company of America ("Guardian") because of an alleged violation of Local Rule 83.51.7. For the following reasons, the motion is denied.

## I. BACKGROUND

In February 2009 Guardian requested that Winston run a conflicts check to determine whether the firm was available to represent it in the instant case and to represent its subsidiary, PAS, in an arbitration proceeding currently pending before the Financial Industry Regulatory Authority. Guardian's opponent in both cases is MetLife, a party for whom Winston had worked in the past. Thus aware of the circumstances, before it agreed to represent Guardian in this case, Winston conducted a thorough investigation of any conflicts that would preclude it from representing Guardian against MetLife. The investigation turned up three possible conflicts.

The first arrangement involved Winston partner Randy Rogers ("Rogers"), who counseled MetLife in making agricultural loans to various borrowers and their affiliates. Rogers' work on those loans originated before MetLife's acquisition of Travelers Insurance Company, for which Rogers originally worked. And, according to Winston's "Conflicts Partner," Anne Thar ("Thar"), Rogers completed his final project for MetLife in January 2009. See Def.'s Resp., Ex. C. Notably, Rogers' work for MetLife did not involve litigation, nor did it involve issues or questions connected to these proceedings.

Secondly, starting in November 2007, Winston partner Mark Weisberg ("Weisberg") counseled MetLife on an assortment of employee benefits matters. According to Kimball Anderson ("Anderson"), a Winston partner that investigated the potential conflicts, Weisberg worked on five projects for MetLife, which he completed sometime in the Fall 2008. And, like Rogers' loan assignments, Weisberg's work did not involve litigation, nor did it involve issues or questions connected to these proceedings. Anderson describes Weisberg's work for MetLife as "isolated" and "infrequent," seeing that MetLife required him to open a new matter with respect to each assignment he took on. Id., Ex. B. On February 18, 2009, in an email to MetLife's in-house benefits attorney, Weisberg acknowledged that "Guardian is an existing client" but nevertheless sought a waiver from MetLife to represent Guardian. Pl.'s Mot., Ex. 4. MetLife refused to provide a waiver.

Finally, Winston partner Christine Graff ("Graff") represented an entity known as McShane Development Company LLC ("McShane"), which is the sole general partner of the McShane/MetLife Master Limited Partnership. MetLife, which is wholly distinct from McShane, is the limited partner in the arrangement. Graff represented McShane during negotiations of the partnership agreement, while MetLife was represented by its own in-house

attorney. According to Graff's declaration, she acted only on behalf of the partnership and on behalf of McShane in connection with partnership matters, but never on behalf of MetLife. Id., Ex. D. The firm's billing records indicate that Winston billed McShane for all work on the partnership matters and listed MetLife as an adverse party. None of Graff's work was connected to the instant litigation.

After conducting an internal investigation of its potential conflicts, which involved interviews with billing partners and a review of relevant accounting records, Winston determined that its projects for MetLife had been completed, although not formally terminated. Importantly, the investigation revealed that Winston's representation of MetLife was, at most, sporadic and did not involve regularly scheduled meetings, conference calls or daily communication. In turn, Anderson and Thar concluded that MetLife was not a current client and, since all matters were complete, Winston could formally terminate its relationship with MetLife and represent Guardian without a conflict. On March 13, 2009 Rogers sent an email to his contacts at MetLife, confirming that Winston was not working on any active matters. Pl.'s Mot., Ex. 6. Then, on March 16, 2009 Winston sent a letter to Karen Francis-Moorer (MetLife refers to Francis-Moorer as a "paralegal," while Winston calls her a "billing contact"), explaining that Winston's representation had concluded. Id., Ex. 5.

In support of its motion, MetLife asserts that based on the nature and extent of Winston's prior representations of MetLife, Winston is barred from representing Guardian in this case. Winston, of course, disagrees. The firm maintains that it completed all outstanding projects for MetLife and formally terminated its representation of MetLife before it agreed to represent Guardian in this case. Thus, according to Winston, MetLife was not a current client when it agreed to represent Guardian, and thus no conflict arose under L.R. 83.51.7. What is more, says

Winston, even if the firm violated L.R. 83.51.7, disqualification would be inappropriate in this case because MetLife failed to satisfy its burden of proving facts that would justify such a drastic remedy. The Court agrees with Winston on the latter point.

## II. DISCUSSION

### A. STANDARD OF DECISION

A motion to disqualify counsel requires a two-step analysis. First, the court considers whether an ethical violation has occurred. Second, if the court finds such a violation, the court then determines whether disqualification is the appropriate remedy. Guillen v. City of Chicago, 956 F. Supp. 1416, 1421 (N.D. Ill. 1997). The professional rules of conduct, as set forth in the Local Rules of the Northern District of Illinois, generally govern motions to disqualify. Andrew Corp. v. Beverly Mfg. Co., 415 F. Supp. 2d 919, 923 (N.D. Ill. 2006). Local Rule 83.51.7 states that "a lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after disclosure." See Conflict of Interest, L.R. § 83.51.7.

In deciding a motion to disqualify, the Court recognizes that "disqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary." Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205, 17 F.3d 1059, 1066 (7th Cir. 1994) (quoting Freeman v. Chi. Musical Instrument Co., 689 F.2d 715, 721 (7th Cir. 1982)); Mercury Vapor Processing Tech., Inc. v. Vill. of Riverdale, 545 F. Supp. 2d 783, 787 (N.D. Ill. 2008). Courts should view motions to disqualify "with extreme caution for they can be misused as techniques of harassment." Freeman, 689 F.2d at 722. Disqualification may serve only to create unnecessary delays and to deprive the parties of their chosen legal advisor. City of Waukegan v.

4

Martinovic, No. 03 C 3984, 2005 WL 3465567, at * 5 (N.D. Ill. Dec. 16, 2005) (citing Guillen, 956 F. Supp. at 1421).

A district court is afforded broad discretion in determining whether disqualification is required in a particular case, though all doubts should be resolved in favor of disqualification. Whiting Corp. v. White Mach. Corp., 567 F.2d 713, 715 (7th Cir. 1977); United States v. Goot, 894 F.2d 231, 235 (7th Cir. 1990). In the end, the party seeking disqualification bears a heavy burden of showing the necessary facts that require disqualification. Weeks v. Samsung Heavy Indus. Co., Ltd., 909 F.Supp. 582, 583 (N.D. Ill. 1996); Guillen, 956 F. Supp. at 1421. With these standards in mind, the Court turns to whether Winston's prior representation of MetLife precludes the firm from representing Guardian in these proceedings.

## B. VIOLATION OF LOCAL RULE 83.51.7

To show that Winston committed an ethical violation, MetLife argues that Winston infringed what is commonly referred to as the "hot potato doctrine." This doctrine bars an attorney from representing a more lucrative client in a case against a less lucrative client, which the attorney dropped like a "hot potato" when the more lucrative client came along. See Alex Munoz Gen. Contractor, Inc. v. MC3D, Inc., No. 98 C 4489, 1998 WL 831806, at *3 (N.D. Ill. Nov. 25, 1998) (citing SWS Fin. Fund v. Salomon Bros., Inc., 790 F. Supp. 1392, 1399 (N.D. Ill. 1992)). MetLife asserts that Winston went out of its way to secure conflict waivers from MetLife and, failing that, dropped MetLife as a client altogether so that it could enter a more lucrative arrangement with Guardian (against MetLife). This, says MetLife, evidences a clear violation of the Court's ethical rules. Another view, however, is that requests for waivers are precautionary. A fair reading of the pleadings does not establish that Winston's conduct was nefarious or underhanded.

Nevertheless, the Court is sufficiently persuaded that Winston was representing MetLife at the time it sent its termination letter to MetLife's non-lawyer, paralegal billing contact, and, in turn, did not technically follow L.R. 83.51.7. There is no dispute that Winston represented MetLife in three, distinct corporate projects over a limited period of time. Those projects may have been isolated and discrete, as Winston alleges, but they were never formally terminated, until Guardian entered the picture.

As Winston points out, we cannot ignore in determining the posture of the attorney-client relationship "the way that attorneys and clients actually behave" and "what they have come to expect from each other in terms of the continuation or termination of the relationship." SWS Fin. Fund, 790 F. Supp. at 1402 (citing Artromick Int'l, Inc. v. Drustar, 134 F.R.D. 226, 229 (S.D. Ohio 1991)). Moreover, it is well-settled that once an attorney-client relationship is established, it does not terminate easily. SWS Fin. Fund, 790 F. Supp. at 1398. Absent an express termination, "something inconsistent with the continuation of the relationship must transpire in order to end the relationship." Id. Examples of inconsistent conduct include: a client filing a grievance against his attorney; a client retaining another attorney; or a client refusing to pay his attorney's bill. Id.

In this case there is nothing inconsistent with Winston's relationship with MetLife. And, without a formal termination of the parties' relationship, MetLife reasonably could have considered itself a current client of Winston at the time Guardian approached Winston to represent it in this case. More importantly, the record is void of any evidence suggesting that MetLife and Winston contemplated an abrupt end to their relationship. In all respects, the representation continued even after Winston completed the immediate projects that MetLife assigned to the firm. See Perillo v. Johnson, 205 F.3d 775, 798-99 (5th Cir. 2000) ("Where the

6

prior representation has not unambiguously been terminated, or is followed closely by the subsequent representation, there is more likely to be a conflict arising from defense counsel's representation of the first client . . . ."); IBM Corp. v. Levin, 579 F.2d 271, 281-82 (3d Cir. 1978) (ruling that client was current client for conflict of interest analysis even where attorney had no specific assignment from client at the time the attorney undertook the adverse representation); Manoir-Electroalloys Corp. v. Amalloy Corp., 711 F. Supp. 188, 194 (D.N.J. 1989) (finding client to be a current client even though the law firm was not actively providing legal services to the client at the time the suit was filed and had not done so for four years); see also Quinones v. Miller, No. 01 C 10752, 2003 WL 21276429, at *29 (S.D.N.Y. June 3, 2003) (the "mere passage of time does not end the attorney-client relationship"); cf. Caban v. United States, 281 F.3d 778, 784 n.4 (8th Cir. 2002) (finding in a criminal case that a conflict based on a concurrent representation despite attorney's representation that work for the client was inactive).

With respect to the partnership agreement, which the parties discuss considerably in their briefs, the record reflects that Graff represented McShane – the general partner to the McShane-MetLife Partnership – for some period of time. To downplay this relationship, Winston points out that an attorney does not represent a limited partner when he or she represents the partnership or one of the general partners. See Ackerman v. Nat'l Prop. Analysts, Inc., 887 F. Supp. 494, 507-08 (S.D.N.Y. 1996) (holding that counsel for limited partnership owed no fiduciary duty to limited partners); Quintel Corp. v. Citibank, 589 F. Supp. 1235, 1239-42 (S.D.N.Y. 1984) (finding no attorney-client relationship between counsel and limited partner where counsel represented partnership). However, despite the cases that Winston cites in support of its position, the underlying theory as to the attorney-partner relationship has not gone unchallenged.

In a case from this district, Pucci v. Santi, 711 F. Supp. 916 (N.D. Ill. 1989), the district court held that an attorney representing a partnership did, in fact, represent each member of that partnership, including its limited partners. In doing so, the district court declined to follow the cases cited by Winston, siding instead with those cases holding that "where an entity is by law an aggregate of individuals, the lawyer has an attorney-client relationship with each of those individuals." Pucci, 711 F. Supp. at 927 n.4 (citing Halverson v. Convenient Food Mart, Inc., 458 F.2d 927, 930 (7th Cir. 1972)). Based on the authority from this district, the Court finds that Graff was not entirely disconnected from MetLife when she represented McShane and the partnership. Winston's argument on this issue is therefore unavailing.

We note, finally, that MetLife's argument assumes that the "hot potato doctrine" applies to all cases where the attorney has completed its work for a client but is yet to formally terminate the relationship. This is not necessarily the case. The "hot potato doctrine" clearly applies to those instances in which a lawyer drops a current client, for which the representation continued, in order to turn that client into a former client as a means of curing a simultaneous representation of adverse interests. Valuepart, Inc. v. Clements, No. 06 C 2709, 2006 WL 2252541, at *2 (N.D. Ill. Aug. 2, 2006) (applying "hot potato" rule where the firm was handling ongoing matters, which may have involved work at the center of the parties' litigation); Alex Munoz Gen. Contractor, Inc., 1998 WL 831806, at *3 (finding "hot potato" rule applied where firm's representation in litigation continued even after subpoena requests were completed).

However, it is not so clear that the "hot potato doctrine" applies in those instances in which a lawyer's representation is sporadic, non-litigious and unrelated to the issues involved in the newer case, as we see here. We add that courts should not be overly eager to substitute a clever phrase for thorough legal analysis. Given the stark differences between this case and the

8

cases that MetLife cites in support of its position, the Court declines to follow such a stringent reading of the "hot potato doctrine." Cf. Gould v. Mitsui Mining & Smelting Co., 738 F. Supp. 1121, 1124 (N.D. Ohio 1990) (observing that the ethical rules should not be applied blindly without consideration of relative handicaps). Nevertheless, because we find that MetLife was Winston's present client on an ongoing basis at the time Winston terminated the relationship, we find that Winston committed a technical violation of L.R. 83.51.7. But the inquiry does not stop there.

## C. DISQUALIFICATION IS NOT AN APPROPRIATE REMEDY

Even if an ethical violation exists, a reviewing court may still deny a motion to disqualify. Indeed, despite MetLife's argument to the contrary, it is well-settled that disqualification does not flow automatically from a finding that a law firm violated a conflict of interest rule. E.g., SWS Fin. Fund, 790 F. Supp. at 1400 (noting that disqualification because of an ethical violation is never automatic); Schiessle v. Stephens, 717 F.2d 417, 420 (7th Cir. 1983) ("disqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary"). And given the unique circumstances of this case, the Court is compelled to deny disqualification.

MetLife has failed entirely to show that it would suffer any harm if Winston represented Guardian in this case. It remains undisputed that Winston's previous, non-litigation work for MetLife was wholly unrelated to MetLife's case against Guardian. It follows, then, that Winston's representation of Guardian would not put MetLife at a disadvantage. In its prior representation of MetLife, Winston did not have access to any confidential information that it could use in this case. Winston did not accrue documents and evidence of which MetLife was unaware. Winston did not forge relationships with any potential witnesses, nor did the firm learn

9

of any facts that had not been disclosed to MetLife. In sum, any client confidences that the parties previously established have not been compromised. A disqualification at this point in the proceedings would only delay the movement of this case, increase the parties' costs and deprive Guardian of its choice of counsel. The Court will not furnish such a result, despite any ethical violations that may have occurred. See McCook Metals LLC v. Alcoa, No. 99 C 3856, 2001 WL 58959, at * 3 (N.D. Ill. Jan. 18, 2001) (refusing to disqualify counsel where confidences had not been breached and the moving party failed to establish how it would have been harmed by the representation); Reuben H. Donnolley Corp. v. Sprint Publ'g & Adver., Inc., No. 95 C 5825, 1996 WL 99902, at *4 (N.D. Ill. Feb. 29, 1996) (finding disqualification improper where moving party pointed "to no actual harm that will befall it from [the firm's] continued representation"); SWS Fin. Fund, 790 F. Supp. at 1400 ("Disqualification [ ] is a blunt device. The sanction of disqualification foists substantial costs upon innocent third parties. The innocent client [ ] may suffer delay, inconvenience and expense and will be deprived of its choice of counsel."); Bobbitt v. Victorian House, Inc., 545 F. Supp. 1124, 1128 (N.D. Ill. 1982) (explaining that disqualification motions have "the usual effect of diverting the litigation from attention to the merits."); see also Prudential Ins. Co. of Am v. Anodyne, Inc., 365 F. Supp. 2d 1232, 1238-1239 (S.D. Fla. 2005) (relying on SWS Fin. Fund and refusing to disqualify counsel despite ethical violation); Gen-Cor, LLC v. Buckeye Corrugated, Inc., 111 F. Supp. 2d 1049, 1055 (S.D. Ind. 2000) (noting that "[t]he key factor weighing against disqualification of [the firm] is that the firm's representation of [its current and prior clients] does not prejudice the [party seeking disqualification]."); Research Corp. Techs., Inc. v. Hewlett-Packard Co., 936 F. Supp. 697, 703 (D. Ariz. 1996) (finding an ethical violation but denying disqualification because "the nature of the ethical violation [was] not egregious" and "nothing indicate[d] that any confidential

10

information related to the pending action has been received by" the counsel in question).

MetLife's motion is therefore denied.

### III. CONCLUSION

For these reasons, Plaintiff Metropolitan Life Insurance Company's motion to disqualify the law firm Winston & Strawn, LLP as counsel for Defendant Guardian Life Insurance Company of America is denied.

IT IS SO ORDERED.

ENTER:

_____
CHARLES R. NORGLE, Judge
United States District Court

DATED: 5/18/09