MHN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) No. 06 C 5812<br>)<br>) Honorable Charles R. Norgle |
| O'M & ASSOCIATES LLC, DBA O'MALLEY & ASSOCIATES and THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is defendants O'M & Associates LLC ("O'M") and Guardian Life Insurance Company of America's ("Guardian") motion for summary judgment. For the following reasons, the motion is granted.

## I. BACKGROUND[1]

### A. Facts

Plaintiff Metropolitan Life Insurance Company ("MetLife") has operated an insurance agency in Downers Grove, Illinois for over twenty-five years (the "MetLife Agency"). From 1985 to 2005, Michael O'Malley ("O'Malley") served as the managing director of the MetLife Agency. In June 1998, MetLife changed the name of the MetLife Agency from 74B Superior Plaza, IL Agency to O'Malley & Associates and began using the O'Malley & Associates name and logo in various marketing materials and customer communications. MetLife never

---

[1] Unless otherwise attributed, the Court takes all facts presented in this Opinion from the parties' Local Rule 56.1(a)(3) and 56.1(b)(3) Statements and Responses and notes the disputed facts within.

registered the name "O'Malley & Associates" as a trademark with the United States Patent and Trademark Office.

### 1. The Departure of O'Malley from the MetLife Agency

In January 2005, MetLife replaced O'Malley as managing director of the MetLife Agency. Accordingly, in April 2005, MetLife changed the name of the MetLife Agency from O'Malley & Associates to Preferred Planning Group. On April 21, 2005, Debbie Forsythe, the director of operations for the MetLife Agency ("Forsythe" or the "Director of Operations"), instructed the Agency's employees to cease using the O'Malley & Associates name. Forsythe's email stated in relevant part as follows:

> Please be certain you are no longer using our former DBA – O'Malley & Associates – on your voice mail, email stationary or business cards. Please either use the Preferred Planning Group or MetLife. Please dispose of all stationary, etc. with the former DBA. We have been advised that we can no longer send stationary with our former DBA, therefore, any stationary with O'Malley & Associates will be returned to your mailbin. If you have not ordered new stationary and business cards please do so at this time.

O'M Mem., Ex. E, at 3.

According to Forsythe's July 24, 2007 testimony, at the time of her email MetLife had no intention of using the O'Malley & Associates name at any point in the future. See id., Ex. C, at 8. Specifically, Forsythe was asked if there was "any intent by MetLife as of April 21, 2005 to ever use the O'Malley & Associates in any way, shape, or form ever again?" Id. Forsythe answered, "[n]o." Id.

### 2. The Creation of the Guardian Agency

In April 2005, O'Malley accepted an offer from MetLife's competitor Guardian to set up a new insurance agency. The new Guardian agency (the "Guardian Agency") opened on July 5, 2005 using the name O'Malley & Associates. The Guardian Agency used the same O'Malley & Associates logo that the MetLife Agency previously used.

2

Subsequent to O'Malley's hiring, defendant O'M hired twenty-one agents who, at the time of their hiring, worked for MetLife.[2] O'M admits that a "handful" of these twenty-one agents retained certain MetLife client files and client information when they left MetLife. In addition, O'M acknowledges that it had the United States Postal Service change the business address for O'Malley & Associates from the MetLife Agency's address to the Guardian Agency's new address. According to MetLife, O'M also transferred the phone number formerly employed by the MetLife Agency to the Guardian Agency.

### 3. Client Letters from the Guardian Agency

At some point after the opening of the Guardian Agency, O'M's agents, relying in part on client lists that O'M's agents possessed while employed by MetLife, sent an announcement to their clients stating that O'Malley & Associates "is pleased to announce we our [sic] moving our offices to a larger location . . . ." MetLife J. A., Ex. WW. On July 25, 2005, certain O'M agents sent another letter to their clients informing them that "I am moving my Downers Grove office and expanding the services available to you." Id., Ex. XX. The second letter provided the new address for O'Malley & Associates and noted that the agent had "enclosed forms to help make this transition to [Guardian's broker-dealer] Park Avenue Securities seamless to you." Id. The letter asked the client to "sign where indicated and return as soon as possible to insure uninterrupted service on your accounts." Id. According to MetLife, the clients' names, social security numbers and MetLife account numbers were already filled in on the transfer of asset forms sent along with the second letter. See id., Ex. YY.

### B. Procedural History

---

[2] It is unclear from the parties' Local Rule 56.1(a)(3) and 56.1(b)(3) Statements and Responses whether all of the twenty-one agents worked for the MetLife Agency at the time of their departure.

MetLife filed the present action against Guardian on October 25, 2006.³ On February 9, 2007, MetLife amended its complaint (the "Amended Complaint") to add O'M as a defendant. MetLife's eight-count Amended Complaint includes one federal claim against O'M and Guardian, brought pursuant to the Lanham Act, 15 U.S.C. § 1125, et seq., and seven state claims. MetLife's Lanham Act claim alleges that defendants violated 15 U.S.C. § 1125(a) by "deceive[ing] others as to the affiliation, connection, or association of the parties, and/or . . . misrepresent[ing] the nature, characteristics, qualities, or origin of the parties' goods, services and commercial activities . . . ." MetLife Am. Compl. ¶ 35. On May 12, 2009, O'M filed a motion for summary judgment with respect to MetLife's Lanham Act claim (the "Motion"). On June 8, 2009, Guardian joined the Motion. The Motion is now fully briefed and before the Court.

## II. DISCUSSION

### A. Standard

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact exists. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works

---

³ At the time this action was filed, MetLife had already filed a state court action, a federal action and an arbitration action based on largely the same facts that gave rise to this action. For a full recitation of the lengthy procedural history of this matter, see Metro. Life Ins. Co. v. Guardian Life Ins. Co. of Am., No. 06 C 5812, 2009 WL 1565650 (N.D. Ill. June 1, 2009).

4

Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chi., 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The inferences construed in the nonmoving party's favor, however, must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89 (1990)).

## B. MetLife's Trademark Infringement Claim

Defendants contend that summary judgment is appropriate here because there is no question of material fact as to either the trademark infringement prong or false advertising prong of MetLife's Lanham Act claim. With respect to trademark infringement, defendants assert that summary judgment is proper because MetLife expressly abandoned the name "O'Malley & Associates" prior to defendants' use of the name and MetLife admitted that it had no intention of reusing the name.

The Lanham Act states with respect to trademark infringement that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any

combination thereof, or any false designation of origin, false or misleading
description of fact, or false or misleading representation of fact, which . . . is
likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,
connection, or association of such person with another person, or as to the origin,
sponsorship, or approval of his or her goods, services, or commercial activities by
another person . . . shall be liable in a civil action by any person who believes that
he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Under 15 U.S.C. § 1127, however, "abandonment of a mark is an affirmative defense to a trademark infringement action." Rust Env't & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1214 (7th Cir. 1997). Abandonment of a mark occurs "[w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127; see also Money Store v. Harriscorp Fin. Inc., 689 F.2d 666, 675 (7th Cir. 1982) ("[A]bandonment requires discontinuance of use as well as intent to abandon."). "'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "Residual use, such as token use, use by sale of the remaining inventory containing the mark, or use merely to prevent others from using the mark, are not bona fide uses under the Lanham Act." MB Fin. Bank, N.A. v. MB Real Estate Servs., L.L.C., No. 02 C 5925, 2003 WL 21462501, at *9 (N.D. Ill. June 23, 2003) (citing Emergency One, Inc. v. Am. FireEagle, Ltd., 228 F.3d 531, 536 (4th Cir. 2000)); see also Miyano Mach. USA, Inc. v. MiyanoHitec Mach. Inc., 576 F.Supp.2d 868, 881-82 (N.D. Ill. 2008) ("Neither residual or token use nor mere promotional use on goods in a different course of trade constitute proper 'use' under the Lanham Act.").

In the present case, the April 21, 2005 email from the MetLife Agency's Director of Operations telling MetLife employees to "be certain" to cease using the "O'Malley & Associates" mark and to dispose of stationary with the "O'Malley & Associates" name demonstrates MetLife's intent to abandon the mark. See MB Fin. Bank, 2003 WL 21462501, at

*8 (citing Hiland Potato Chip Co. v. Culbro Snack Foods, Inc., 720 F.2d 981, 983 (8th Cir. 1983)) ("An announcement that a mark will not be used in the future is strong evidence of an intent to abandon the mark."). Moreover, the Director of Operations' testimony makes clear that at the time of the April 21, 2005 email, MetLife did not intend to ever use the "O'Malley & Associates" name again. See O'M Mem., Ex. C, at 8. Thus, there is no dispute that as of April 2005, MetLife intended to abandon the "O'Malley & Associates" mark and had no intent to use the mark again. See MB Fin. Bank, 2003 WL 21462501, at *8 (holding that plaintiff demonstrated its intent to abandon a mark by instructing employees to remove all items from sight that contained the mark, shred all materials containing the logo and take home all office supplies and accessories containing the logo).

MetLife argues that regardless of whether it intended to abandon the "O'Malley & Associates" mark, the record demonstrates that MetLife did not actually abandon the mark. As evidence of MetLife's continued use of the "O'Malley & Associates" mark, MetLife directs the Court to a single faxed resignation letter, sent July 1, 2005, that contains the name "O'Malley & Associates" in the fax header. See MetLife Resp., Ex. IIII. The sending of one internal fax with the name "O'Malley & Associates" in the header is at best token or residual use of the mark, however, which is not sufficient to constitute bona fide use of the mark. See Miyano Mach., 576 F.Supp.2d at 881-82. Therefore, because MetLife provides no other evidence of MetLife's post-April 2005 use of the "O'Malley & Associates" name, the Court finds that there is no question of material fact regarding MetLife's actual abandonment of the name.

MetLife next claims that the "residual goodwill" contained in the name "O'Malley & Associates" precludes a finding of abandonment, even without an intent by MetLife to resume use of the mark, because O'M committed "bad acts" with respect to the mark. MetLife Resp. at

7

10, 13. MetLife offers scant case law to support this interpretation of Lanham Act abandonment law. In the two cases MetLife cites, the court specifically relied on the plaintiff's intent to resume use of the mark and thus concluded that a finding of abandonment was not appropriate. See Defiance Button Mach. Co. v. C & C Metal Prods. Corp., 759 F.2d 1053, 1061 (2d Cir. 1995) (finding no abandonment where plaintiff planned to "resume its former business under its own trade name and sell buttons and parts under its . . . trademark"); see also Peter Luger Inc. v. Silver Star Meats, Inc., No. Civ. A. 01-1557, 2002 WL 1870066, at *15 (W.D. Pa. May 17, 2002) ("In light of . . . evidence that the brand and trade dress *may be reintroduced*, we conclude that although defendants' abandonment defense is tenable, there is not a strong likelihood that defendants will be able to prove abandonment . . . .") (emphasis added). Thus, Defiance and Peter Luger are not applicable here because, unlike the plaintiffs in those cases, MetLife has admitted that after April 2005 it had no intent to resume use of the "O'Malley & Associates" mark.

It is true that in certain specific instances the Seventh Circuit has found that a trademark infringement claim can survive even after a plaintiff has abandoned its mark. For example, in Rust Environment, the court noted that "where a party abandons a mark confusingly similar to its newly adopted mark, a third party may not necessarily be entitled to use the abandoned mark in a way that is confusingly similar to the newly adopted mark." 131 F.3d at 1215 (citing Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship, 34 F.3d 410, 413 (7th Cir. 1994)). The Rust Environment court clarified, though, that in such a circumstance, "the relevant comparison . . . is between the new name adopted by the third party . . . and the new name adopted by the holder of the abandoned mark . . . ." Id. Importantly, "the comparison is not . . . between the new name adopted by the third party . . . and the abandoned name . . . ." Id. Thus,

8

in Rust Environment the court rejected plaintiff's argument that defendants should be enjoined from using the name Donohue & Associates because the name was confusingly similar to plaintiff's previous name of Donohue & Associates. Id. Rather, the court held that "because plaintiff adopted a new mark, 'Rust' which was not confusingly similar to its abandoned mark, 'Donohue & Associates,' . . . , defendants' use of the abandoned name 'Donohue & Associates' is not a violation of the Lanham Act." Id.

Here, as in Rust Environment, MetLife adopted a new mark, "Preferred Planning Group," that was in no way similar to its abandoned mark, "O'Malley & Associates." Although defendants used a name, "O'Malley & Associates," that was identical to MetLife's abandoned mark, under Rust Environment and Indianapolis Colts, the relevant comparison for Lanham Act purposes is between the new name adopted by defendants, "O'Malley & Associates," and the new name adopted by the holder of the abandoned mark, "Preferred Planning Group." MetLife makes no argument that the "O'Malley & Associates" name is in any way confusingly similar to the "Preferred Planning Group" name and such an argument would be unsupported by the facts of this case. Therefore, although defendants' allegedly deceptive use of the "O'Malley & Associates" name may give rise to actionable state law claims, evidence of such use is not on its own sufficient to deny defendants' Motion with respect to MetLife's Lanham Act claim.

## C. MetLife's False Advertising Claim

MetLife suggests that even if there is no question of material fact as to the trademark infringement prong of its Lanham Act claim, MetLife has put forth sufficient evidence to survive summary judgment with respect to its § 1125(a)(1)(B) false advertising claim. The Court does not agree.

Section 1125(a)(1)(B) of the Lanham Act prohibits one from "misrepresent[ing] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" in "commercial advertising or promotion." In order to establish a false advertising claim under § 1125(a)(1)(B), a plaintiff must prove:

> (1) [A] false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 819 (7th Cir. 1999).

Here, MetLife claims that Guardian violated § 1125(a)(1)(B) by "sending out announcements to MetLife customers, using the name and logo of the MetLife office," that "misled and solicited consumers." MetLife Resp. at 7. MetLife fails to acknowledge though that "letters sent to customers do not come within the scope of [§ 1125(a)(1)(B)] – which is limited to false or misleading 'commercial advertising or promotion' and does not cover all deceitful business practices." ISI Int'l, Inc. v. Borden Ladner Gervais LLP, 316 F.3d 731, 733 (7th Cir. 2003); see also Conditioned Ocular Enhancement, Inc. v. Bonaventura, 458 F.Supp.2d 704, 710 (N.D. Ill. 2006) ("Seventh Circuit law is clear: consumer letters do not constitute false or misleading commercial advertising or promotion.").

The Seventh Circuit has explained that "[a]dvertising is a form of promotion to *anonymous* recipients, as distinguished from face-to-face communication." First Health Group Corp. v. BCE Emergis Corp., 269 F.3d 800, 803 (7th Cir. 2001) (emphasis added). Therefore, "an advertisement read by millions (or even thousands in a trade magazine) is advertising, while a person-to-person pitch by an account executive is not." Id. at 803-04; see also Foboha GmbH

v. Gram Tech., Inc., No. 08 C 969, 2008 WL 4619795, at *3 (N.D. Ill. Oct. 15, 2008) ("Direct communications, whether in person or by letter, are not commercial advertising or promotion as our Court of Appeals has defined those terms.").

In the present case, the allegedly deceitful announcements O'M sent out to customers via mail were direct communications that do not come within the scope of § 1125(a)(1)(B). The announcements were not directed to anonymous recipients; rather, they were sent to those individuals on O'M's agents' client lists. In addition, the second letter that enclosed a transfer of asset form was highly individualized – the transfer of asset form contained not just the customer's name, but his or her social security number and MetLife account number as well. Therefore, although the announcements may fall under the category of "deceitful business practices," ISI Int'l, Inc., 316 F.3d at 733, because the announcements were sent to specific customers by mail, the allegedly deceptive statements contained in those announcements are not actionable under the Lanham Act. Id.; see also Conditioned Ocular, 458 F.Supp.2d at 710 (dismissing counter-plaintiff's false advertising Lanham Act claim because the allegedly misleading letters counter-defendant sent to counter-plaintiff's prospective customers were not commercial advertising or promotion).

## D. The Court's Jurisdiction over MetLife's Remaining State Claims

Although the Court grants defendants' summary judgment motion with respect to MetLife's sole federal claim, the Court will retain jurisdiction over MetLife's remaining state claims. 28 U.S.C. § 1367(c) provides that a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." See also Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Group, 551

F.3d 599, 608 (7th Cir. 2008) ("While a district court *may* relinquish its supplemental jurisdiction if one of the conditions of § 1367 is satisfied, it is not required to do so.").

The general rule in the Seventh Circuit is that "when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims." Williams v. Rodriguez, 509 F.3d 392, 404 (7th Cir. 2007). "This rule however, is subject to three recognized exceptions: when the refiling of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." Id.

Here, there is the distinct possibility that Illinois' statute of limitations scheme would bar MetLife from re-filing its state claims. See 735 ILL. COMP. STAT. 5/13-237 (limiting plaintiffs to one re-filing of a cause of action); Evans ex rel. Evans v. Lederle Labs., 167 F.3d 1106, 1110 (7th Cir. 1999) (stating that courts consider 735 ILL. COMP. STAT. 5/13-237 part of Illinois' statute of limitations scheme); see also Metro. Life Ins. Co., 2009 WL 1565650, at *3 (describing the potential applicability of Illinois' one-filing rule to this matter). In addition, the parties have been litigating this matter for almost three years and have conducted significant discovery. Therefore, under these circumstances, the exception to the general rule regarding pendant state claims applies and the Court will retain jurisdiction over MetLife's remaining pendant state claims. See O'Brien v. Continental Ill. Nat'l Bank & Trust Co. of Chi., 593 F.2d 54, 65 (7th Cir. 1979) (holding that plaintiffs should have been allowed to pursue their pendant state claims in federal court where it appeared likely that if the involuntary dismissals of plaintiffs' state law claims were allowed to stand, those claims would be time-barred even though they were timely asserted in the federal court); see also Woods v. Southwest Airlines, Co., 523 F.Supp.2d 812, 820 (N.D. Ill. 2007) (citing Horwitz v. Bd. of Educ. of Avoca Sch. Dist., 260 F.3d 602, 617 (7th

Cir. 2001)) ("Even in a case where the claims upon which a federal court's original jurisdiction was based have been eliminated, a court may continue to exercise supplemental jurisdiction over purely state claims if significant time and resources have been expended when the federal claims drop out.").

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Court retains jurisdiction over MetLife's remaining state claims.

IT IS SO ORDERED.

                ENTER:

                CHARLES RONALD NORGLE, Judge
                United States District Court

DATED: September 16, 2009